IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 23-CR-20023-001 |
| ) | |
| BRETT BARTLETT, ) | |
| ) | |
| Defendant. ) | |

**THE UNITED STATES OF AMERICA'S RESPONSE TO THE
DEFENDANT'S SENTENCING MEMORANDUM**

NOW COMES the United States of America, by Gregory K. Harris, United States Attorney for the Central District of Illinois, and Eugene L. Miller, Assistant United States Attorney, and hereby responds to the Defendant's Sentencing Memorandum requesting a sentence well below the applicable guideline, R. 46, and addresses what the United States understands to be the outstanding defense objections to the Revised Presentence Report, R. 47.

**BACKGROUND[1]**

The defendant, Brett Bartlett, has pleaded guilty to three counts of Wire Fraud in violation of 18 U.S.C. § 1343, Mail Fraud in violation of 18 U.S.C. § 1344, Securities Fraud in violation of 15 U.S.C. § 78j(b), and Money Laundering in violation of 18 U.S.C. § 1957. The investment fraud scheme involved over 1,000 victims who suffered an actual loss of $22,502,092.66.

---
[1] This information is detailed in the Presentence Report (PSR).

Based on recent discussions with defense counsel, the United States understands that the only outstanding defense objection to the Revised Presentence Report is to the two-level increase for sophisticated means. The United States supports the sophisticated means enhancement. With the enhancement, the defendant's guideline imprisonment range is 188 to 235 months. Without the enhancement, the defendant's guideline imprisonment range is 151 to 188 months. The defendant requests a sentence of imprisonment well below the guideline range. For the reasons stated herein, the United States requests a 188-month sentence of imprisonment, to be followed by a three-year term of supervised release, $22,502,092.66 in restitution, no fine in light of the substantial restitution obligation, and a $600 special assessment.

## THE APPLICABLE SENTENCING GUIDELINES

### I.   Sophisticated Means Enhancement

The United States understands that the defendant intends to withdraw his objections that are listed in the Revised PSR as one (amount of restitution), two (financial hardship to 25 victims or more), and four (zero-point offender). This leaves objection three (sophisticated means) as the sole objection to the Sentencing Guidelines that the Court needs to resolve at sentencing.

As set forth in the Addendum to the PSR, the United States submits that a two-offense level increase is appropriate under Section 2B1.1(b)(10)(C) because it involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. While the Guidelines require "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an

2

offense," see U.S.S.G. § 2B1.1 comment. n.9(B), they do "not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual fraud case." *United States v. Kowalski*, 103 F.4th 1273, 1278 (7th Cir. 2024) (quoting *United States v. Lundberg*, 990 F.3d 1087, 1097 (7th Cir. 2021)); *accord United States v. Griffin*, 76 F.4th 724, 751 (7th Cir. 2023). Here, the defendant's conduct in both executing and concealing the scheme was especially complex and intricate.

In the plea agreement, the defendant acknowledged, for example, that (1) he created and used multiple corporations as part of the scheme, including 7M E-Group, Dynasty Toys, Inc., and the "holding company," Concept Management Company, Inc.; (2) he offered "preferred shares" to "Reg A+ investors" offering dividends and a future initial public offering and creating stock certificates; (3) he told investors that he was expanding the Dynasty product line from toys to proven digital marketing and gold production, and then offered investors "gold contracts"; (4) he created a private placement memorandum that he showed to investors and claimed he was going to file with the Securities and Exchange Commission; (5) he created online "dashboards" that misled investors into believe that they were receiving returns higher than they actually were; and (6) to further avoid detection, he sent millions of dollars in checks to investors drawn on a Dynasty Toys, Inc. account with insufficient funds. This complex and especially intricate conduct took place over the course of more than two years, from 2018 through mid-2020. This displayed a greater level of planning and concealment than the usual fraud case.

The Guidelines specifically list the use of "corporate shells" as indicating sophisticated means. U.S.S.G. § 2B1.1, comment. (n.9(B)). Here, the defendant used Concept Management Company, a shell company that he created, to defraud investors by falsely representing that CMC was going to purchase Dynasty Toys shares for $120 million. "This conduct alone justifies the enhancement." *See Kowalski*, 103 F.4th at 1278 (affirming enhancement because conduct specifically identified as sophisticated in guidelines commentary).

Moreover, the scheme lasted for years and ultimately ensnared over 1000 victims across the United States and beyond, some of whom used their retirement accounts to invest with the defendant, further showing the level of sophistication. *See, e.g., United States v. Harris,* 791 F.3d 772, 781 (7th Cir. 2015) (affirming sophisticated means enhancement where scheme lasted three years and involved numerous victims); *United States v. Anobah*, 734 F.3d 733, 739 (7th Cir.2013) (affirming sophisticated means enhancement where false documents scheme spread over two states).

While the sophisticated means enhancement is not limited to the "mastermind of the scheme," *see United States v. Muresanu*, 951 F.3d 833, 840 (7th Cir. 2020), the defendant here *was* the mastermind of this scheme. Similarly, although a sophisticated scheme need not exhibit intelligence or expertise, *United States v. Wayland*, 549 F.3d 526, 529 (7th Cir. 2008) (citing *Untied States v. Fife*, 471 F.3d 750, 754 (7th Cir. 2006)), this one did, and consequently, was able to pull in some sophisticated investors with large investments. Even if most of the defendant's individual actions were unsophisticated (which they

4

weren't), an overall scheme that lasts a period of years and involves coordinated fraudulent transactions is sophisticated under the guidelines. *Wayland*, 549 F.3d at 529.

The Seventh Circuit has repeatedly affirmed the sophisticated means enhancement in fraud cases involving equally, or even much less, complex or intricate schemes than this one. *See, e.g., Kowalski*, 103 F.4th at 1278 (using accounts to conceal bankruptcy assets); *Lundberg*, 990 F.3d at 1098 (falsifying tax forms to obtain lease approval); *United States v. Friedman*, 971 F.3d, 700 717 (7th Cir. 2020) (three-year fraud that included creation of phony corporate resolution documents); *United States v. Bickart*, 825 F.3d 832, 837-38 (7th Cir. 2016) (fabricating tax forms went beyond typical fraud, noting guidelines did not require conduct to necessarily go far beyond); *United States v. Ghaddar*, 678 F.3d 600, 603 (7th Cir. 2012) (actions in skimming currency receipts viewed as a whole); *United States v. Kontny*, 238 F.3d 815, 820 (7th Cir. 2001) (falsifying payment stubs). The defendant's scheme here clearly displayed a greater level of planning and concealment than the usual fraud case. Thus, the Revised PSR properly applied the two-level enhancement for sophisticated means pursuant to Section 2B1.1(b)(10)(C).

## STATUTORY SENTENCING FACTORS

The United States submits that a within-guidelines sentence of 188 months of imprisonment is necessary to satisfy the sentencing factors found at 18 U.S.C. § 3553(a). A sentencing judge undertakes a two-step process when calculating a defendant's sentence. *United States v. Omole*, 523 F.3d 691, 697 (7th Cir. 2008). "The judge is first required to calculate the proper advisory guidelines range. Then, after hearing the parties' arguments, the judge must consider the factors enunciated in 18 U.S.C. § 3553(a)

to decide whether the defendant's sentence should fall within that guidelines range." *Id.* (citation omitted) (citing *Gall v. United States*, 128 S. Ct. 586 (2007)). The Seventh Circuit has made it clear that, regardless of technical guidelines applications, a sentencing court must exercise its discretion under Section 3553(a) to arrive at the proper sentence. *See United States v. Carter*, 961 F.3d 953, 959 (7th Cir. 2020) (noting "a judge could sensibly ask why the abstract and hypothetical classifications" required by the Guidelines "should be deemed important in deciding an appropriate sentence in the particular defendant's case").

I.    **Nature and Circumstances of the Offense**

The nature and circumstances of this offense warrant a sentence of 188 months of imprisonment. As detailed in the Revised PSR and the Victim Impact Statements filed under seal, the defendant's fraudulent conduct caused devastating losses for hundreds of victims totaling over $22 million. The defendant argues that the defendant's conduct warrants a sentence well below the advisory guidelines range. As would be expected, many of the victims strongly disagree.

Common themes in the submitted Victim Impact Statements are the devastating financial impact on the victims, as well as the overwhelming sense of betrayal and embarrassment at being defrauded by someone they trusted:[2]

---

[2] The full statements have been filed under seal with the Court. These excerpts have been edited for grammar, punctuation, and to protect the anonymity of the victims. Per the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(4), a few of the victims may request the United States to read their statements out loud to the Court and the defendant or to address the Court and the defendant themselves during the sentencing hearing. This is not anticipated to prevent the completion of the sentencing hearing during the time scheduled on November 25, 2024.

*Bartlett portrayed himself as a Christian, a family man, and traded on the good will and reputations of other reputable men and women. My investment was a significant amount to me. I hoped my investment would benefit my three children in the future, helping them establish their lives and well-being. Instead, investor funds were used by Bartlett and his family to live well and leave the swindled men and women to suffer financial hardship, humiliation, and disillusionment caused by his actions.

*Bartlett took advantage of us good hard-working people. We were told he was going to grow our investment to supplement our retirement. My husband and myself are seniors and we will never be able to make this money back. It's gone. And it hurts us tremendously.

*We had two good friends at our encouragement invest over $100,000. It's hard to look them in the face and say it's all gone. We had to tell each of our five grandchildren you no longer have $5,000. We had a knot in our stomach doing so. Bartlett stole our golden years' dreams due to his dishonesty.

*Bartlett stole money from a veteran.

*I feel my husband was embarrassed about making the decision to invest. He didn't want to talk about it even years later. We didn't tell anyone about it outside of the impacted group. I think it made us feel dumb that we were duped. Our good friend, who told us about the opportunity, was close to suicide.

*This was a pure crime of deceit. Bartlett continually lied to investors. He knew exactly what he was doing. I have a text string with him where I asked for my investment in Dynasty to be cashed out. He stated he would do this in a week or two. This was in December. This never happened, however. Losing $150,000 was a difficult sum to overcome.

*Bartlett invoked faith, God, our families, his own family, and used every trick in trying to make his investors trust him. This loss from his crime altered several of our plans for retirement. It created stress and anger, ruined relationships, caused us to distrust more and more, and simply took the joy out of our lives for an extended period of time.

*While the financial loss has been significant, the emotional and psychological toll has been even more severe. His deceit has shattered my confidence and trust in people – something far more valuable than any monetary loss.

*While his wife brags about spending $300 a month on her nails, those of us who invested with Brett are left holding the bag. He did not break me but stole the hard-earned money we invested for our grandchildren.

*I have never met a more devious and dishonest person in the financial realm. I personally lost my entire retirement savings that I had invested during my career for 40 years. This changed the way our family faced the future. We went from a reasonable retirement plan to no plan in a matter of days. It affected our ability to help our 19 grandchildren go to college. I know it negatively changed our lives in many ways.

*I invested in Brett's company and was promised to get 40% increase. It might not sound much to a lot of people, but that money took months for me to raise! I come from the Philippines, and you can imagine salaries here don't go up that much.

*I've invested hundreds of hours attempting to find resolution to this matter, which has placed significant financial hardship and mental suffering on my family.

*The consequences of this fraudulent scheme have been catastrophic. It has caused immense stress, anxiety, and uncertainty about my financial future.

*I lost the $50,000 I invested with Bartlett. I have 8 children and 17 grandchildren, and a loss of this magnitude hurts. I had hoped to help my grandchildren attend the college of their choice and this didn't happen. I have been too embarrassed to tell my children why I wasn't able to help like I had promised.

*My husband and I were mislead by Bartlett and made to believe he was using our investment of $100,000 to help fund a family face mask business during COVID. This caused severe hardship on my family because we planned to use the money to help pay for our children's schooling expenses. We are devastated and feel taken advantage of in a time that our country was in a pandemic.

*I'm 74 years old and my husband is 78 years old. We both worked hard all our lives so that we would have enough to pay for the bills when we could not longer work and so that we wouldn't be a burden to our kids, but Bartlett stole most of that. I blame not only Bartlett – but us for trusting him.

*At the time, my investment represented my entire savings, crucial for supporting my children and family. The scam forced us to make significant sacrifices in their education and activities due to the financial strain.

*I have a son who is now 11. He would have been five when I started to send money to Bartlett. When I think of what that money could have done if it had been spent

8

on him, as opposed to wasting it all on a criminal, it makes me sick to my stomach. I spent 100s of hours trying to find out what had happened and what I could do. It has caused me a great deal of stress, sleepless nights, and constant worry.

*We trusted Bartlett with a huge part of our retirement savings. It drastically changed our lives from starting to enjoy our free time to trying to learn to trust people again and trying to figure out how to make up for the loss. We were forced back into the workplace and started liquidating anything we could. We were knocked into depression and devastation. The health of our bodies and minds have suffered due to the stress he caused us to have.

*I was in a rough time in my business, and this jeopardized my financial well-being dramatically. I invested in good faith and am in a significantly poorer position because of this.

*My Mom and Dad, who were investors and victimized by Bartlett, had to sell their home in Illinois. When my parents had to sell their home, we had nowhere to return to. Our family gatherings ceased to exist. My younger son specifically, had a very emotional time that affected his mental health to the point of needing treatment.

*Emotionally, this crime has left an indelible scar. The emotional toll has been immense, knowing that I was deceived and that my family's future financial security was compromised by someone I thought I could trust. The financial impact has been equally devastating. This money was earmarked for my children's education.

*My husband and I lost our Amazon business directly due to Brett Bartlett's lies and fraud. When Amazon suspended our account with no warning, we lost everything. We lost our business and our income. The business was supposed to be our retirement income, now we work DoorDash.

*Brett pretended to be morally driven in order to fleece honest, hard-working people out of their savings, and in some cases, their entire next eggs. Brett ruined people by his greed.

*We had hoped to bless family members and Christian ministries. Instead, we have had less to give, our family has thought less of us, and we have though less of ourselves.

*We leaned our mistake and trusted a person too much. We are still paying small installments to friends and family members. It also damaged our marriage. A $300,000 investment might be small for Bartlett, however, we were in a bind for debt payments for a long time.

The comments of the Court that sentenced Bernie Madoff are instructive regarding the appropriate sentence based on the nature and circumstances of a large-scale investment fraud offense. No doubt, the length (3 years versus 20 years) and scope ($22 million versus $13 billion) of the fraud schemes are different, but regarding certain key factors, there are many similarities:

> The fraud was brazen, as victims were told their monies were being invested in stocks when they were not. Instead, Mr. Madoff (and others) fabricated millions of pages of account statements purporting to confirm trades that were never made and balances that did not exist. The financial loss was enormous . . . . The breach of trust was massive . . . . He even lied to a grieving widow. Individual investors made important decisions about their lives – "when to retire, how to care for elderly parents, whether to buy a car or sell a house, how to save for their children's college tuition," . . . all based on false information about fictitious accounts. . . . [V]ictims wrote to the Court attesting to the devastating impact the loss of their savings had on their lives. . . . I sentenced Mr. Madoff to 150 years' imprisonment. . . . In my view, Mr. Madoff's crimes were "extraordinarily evil," and I sentenced him accordingly.

*United States v. Madoff*, 465 F. Supp. 3d 343, 346-48 (S.D.N.Y. 2020) (citations omitted) (denying Madoff's motion for compassionate release). In denying the motion for compassionate release, the Court specifically rejected Madoff's claim that "[m]y business was perfectly legitimate for 36 years, and I just made a mistake at one point, and I didn't realize at the time that I wouldn't be able to get myself out of it . . . ." *Id.* at 352.

Unfortunately, the defendant's conduct in falsely telling his victims that their money was invested in Dynasty Toys and his related corporations, fabricating "dashboards" to confirm balances that did not exist, lying to individual investors, and sending them fraudulent checks also resulted in the victims making important life decisions based on the false information and suffering devastating impacts. Moreover, an

10

aggravating factor present here, which was not present in the Madoff fraud scheme, is that the defendant took advantage of the religious faith of many of his victims to gain their trust. *See United States v. Grigg*, 434 F. App'x 530, 532-33 (6th Cir. 2011) (affirming that the district court could use the defendant's appeal to the victim's religious beliefs as an aggravating factor).

## II.     History and Characteristics of the Defendant

### A.     No criminal history points

The defendant has no criminal history points, which is not surprising or extraordinary in an investment fraud case. Those with criminal convictions are often not in a position to gain the trust of their victims. In fact, Madoff was a first-time felony offender, but the Court discounted that fact because his criminal conduct went on for years and "he was caught only because his scheme began to unravel with the financial crisis as he was unable to keep up with the increasing requests for redemptions." *Madoff*, 465 F. Supp. 3d at 351. Likewise, here, the defendant's criminal conduct took place over the course of years, not months, and unraveled as the pandemic hit and he was unable to meet the victims' increasing requests for redemptions. Regardless, the fact that the defendant has no criminal history points is already taken into account by the sentencing guidelines, which place the defendant in Criminal History Category I.

The defendant agrees that he is not entitled to the newly enacted two-point reduction for zero-point offenders because the defendant's conduct personally caused substantial financial hardship. *See* U.S.S.G. § 4C1.1(a)(6). Nonetheless, the defendant has indicated that he may argue that this limitation on the two-point reduction is not

11

appropriate. While the Court is free to disagree with the generalized policy of the Guidelines, *United States v. Jones*, 56 F.4th 455, 514 (7th Cir. 2022), it is never obligated to do so, *id.*, and in fact, is not obligated to even address policy disagreements with the Guidelines. *See United States v. Stephens*, 986 F.3d 1004, 1010 (7th Cir. 2021) ("[A] sentencing court may pass over generalized policy disagreements with the Guidelines."). The United States did not find any district courts who have expressed any disagreement with the Sentencing Commission's reasonable decision not to provide a two-level reduction to defendants, like Bartlett, who have personally caused substantial financial hardship to victims. *Cf. United States v. Gowing*, 2024 WL 3607112, at *2 (S.D.N.Y. July 30, 2024) (denying reduction where total loss amount over $15 million caused substantial financial hardship to victims); *United States v. Pagartanis*, 2024 WL 2111544, at *2 (E.D.N.Y. May 10, 2024) (denying reduction under U.S.S.G. § 4C1.1(a)(6) "because [the defendant] personally stole over $13 million from more than a dozen victims . . . through the sale of fraudulent investments and Ponzi scheme-like activity").

    B.    Family ties and responsibilities

The Sentencing Commission has determined that a defendant's family ties and responsibilities are not ordinarily relevant in determining whether a sentence departure may be warranted. *See* U.S.S.G. § 5H1.6. This is because a defendant's family will always "suffer to some extent from the absence of a parent through incarceration." *Id.* at comment. (n.1(B)(ii)). "Imprisoning the mother of a child for even a short period of time is bound to be a wrenching experience for the child, but the guidelines do not contemplate a discount for parents of children." *United States v. Stefonek*, 179 F.3d 1030,

1038 (7th Cir. 1999). A parent is, or at least should be aware of these potential consequences, when they commit a crime:

> Most families suffer emotional and financial harm when a parent is imprisoned. Any experienced district judge has heard about those effects many times and must recognize that those effects are consequences of the parent's crime, not the sentence imposed. During the Garys' joint sentencing hearing, Judge Reagan made that clear in responding to Stacie Gary's family-ties argument in mitigation. Mitigating arguments about such general hardships typically do not require any discussion at all.

*United States v. Gary*, 613 F.3d 706, 710 (7th Cir. 2010) (affirming district court's refusal to impose more lenient sentences despite that both parents were facing prison).

    C.    Acceptance of responsibility

The United States acknowledges, as it did in the plea agreement, that the defendant has accepted responsibility for his criminal conduct. In fact, following his indictment, the defendant immediately admitted his guilt and agreed to cooperate with the United States. The defendant's cooperation, however, did not and is not anticipated to substantially assist in the investigation or prosecution of another person who has committed an offense. *See* U.S.S.G. § 5K1.1. Nonetheless, based on the defendant's acceptance of responsibility, including his cooperation, the United States is recommending a sentence at the bottom of the applicable guideline range, rather than a sentence at the top of the range or an upward variance, which would otherwise be appropriate.

Also, while it is commendable that the defendant has expressed remorse and contrition and submitted a restitution and release plan, R. 46- 1, 2, & 3, these actions do not rise to the level of extraordinary acceptance of responsibility warranting a variance

below the applicable guideline range. The defendant's scheme was exposed in May and June of 2020, when millions of dollars of checks that the defendant mailed to investors bounced. During that same time frame, the defendant moved hundreds of thousands of dollars from his business accounts to his personal bank accounts. The federal investigation then took place over the ensuing two-and-a-half years, resulting in a federal indictment in 2023. The defendant was aware of the federal investigation but did not accept responsibility for his criminal conduct until after he was indicted and there was no money available to pay restitution.

Under these circumstances, the defendant's acceptance of responsibility, including his restitution plan, is not so extraordinary as to warrant a variance from the Guidelines. *See, e.g., United States v. Eberts*, 829 F.3d 882, 885 (7th Cir. 2016) (finding that a $400,000 restitution payment made days before he pleaded guilty, but three years after he owed the money, was not extraordinary); *United States v. Grasser*, 312 F.3d 336, 341 (7th Cir. 2002) (reversing district court's departure based on finding of extraordinary acceptance of responsibility where defendant paid restitution prior to sentencing, but after indictment); *see also United States v. Oregon*, 58 F.4th 298, 304 (7th Cir. 2023) (noting that paying restitution, even prior to adjudication of guilt, does not require a lower sentence).

### III. Remaining Section 3553(a) Sentencing Factors

Finally, the other sentencing factors under Section 3553(a) support a sentence of 188 months of imprisonment.

A.      Provide just punishment and promote respect for the law

The within-guidelines sentence of 188 months is within the statutory maximum sentence for any one of the defendant's Wire Fraud, Mail Fraud, and Securities Fraud convictions. (In the Madoff case, the district court had to stack the individual counts to arrive at the sentence of 150 years.) Thus, a sentence of 188 months is well within the statutory range that Congress determined was appropriate for the defendant's criminal conduct.

B.      Provide adequate deterrence to others

Deterrence is especially necessary in a case where the defendant defrauded investors of over $22 million. Although the United States credits the defendant's statement that he will not engage in such a fraud in the future, there are many other would-be fraudsters who will not be deterred by a lesser sentence. In this case, the United States is requesting approximately 8 ½ months of imprisonment for every $1 million the defendant's victims lost.[3] Unfortunately, many individuals would not be deterred by the threat of a lesser sentence as punishment for obtaining $22 million.

C.      Avoid unwarranted sentencing disparities

Section 3553(a)(6) directs that a sentencing court should consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. A sentence of less than 188 months of

---

[3] Based on the First Step Act's changes to the calculation of the Bureau of Prison's good time credits and the availability of home detention, the defendant will serve far less than 85% of the sentence of imprisonment imposed by this Court.

15

imprisonment would create an unwarranted sentencing disparity between the defendant and similarly situated defendants.

"[T]he Sentencing Guidelines are themselves an anti-disparity formula . . . [and] to base a sentence on a properly determined Guidelines range is to give adequate consideration to the relation between the defendant's sentence and those of other persons." *Oregon,* 58 F.4th 298, 305 (7th Cir. 2023) (citing *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017)). "The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *Oregon*, 58 F.4th at 305 (citing *United States v. Sanchez*, 989 F.3d 523, 541 (7th Cir. 2021) and *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)).

## CONCLUSION

The United States submits that the Section 3553(a) factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and importantly, to afford adequate deterrence to other potential large-scale fraudsters, requires a sentence of 188 months of imprisonment, to be followed

by three years of supervised release,[4] $22,502,092.66 restitution, no fine in light of the agreed restitution amount, and a $600 special assessment.

                    Respectfully submitted,

                    GREGORY K. HARRIS
                    UNITED STATES ATTORNEY

                    s/ Eugene L. Miller
                    Eugene L. Miller, Bar No. IL 6209521
                    Assistant United States Attorney
                    201 S. Vine St., Suite 226
                    Urbana, IL 61802
                    Phone:  217/373-5875
                    Fax:  217-373-5891
                    eugene.miller@usdoj.gov

---

[4] The United States has no objection to the proposed conditions of supervised release listed in the PSR, and the defendant has likewise filed no objections to those listed conditions or the reasons offered in support of those conditions.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217-373-5891
eugene.miller@usdoj.gov
